SOUTHERN DISTRICT OF MISSISSIPPI
FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## HATTIESBURG DIVISION

SEP 2 2 2025

ARTHUR JOHNSTON
BY _____ DEPUTY

| | |
|---|---|
| RAFEAL C. JOSEPH,  )<br><br>PLAINTIFF,  )<br><br>vs.  )<br><br>THE UNIVERSITY OF SOUTHERN  )<br>MISSISSIPPI; VALENCIA WALLS, in her  )<br>individual capacity; OMEGA PSI PHI  )<br>FRATERNITY, INC.; NU ETA CHAPTER  )<br>OF OMEGA PSI PHI; PHI RHO CHAPTER  )<br>OF OMEGA PSI PHI FRATERNITY, INC  )<br>dba HUB CITY UPLIFT INITIATIVE, INC.;  )<br>OMEGA PSI PHI MS; TERRY CARTER  )<br>individually and as an active member of  )<br>NU ETA CHAPTER OF OMEGA PSI PHI;  )<br>and JOHN DOES 1-15 IN THEIR  )<br>INDIVIDUAL AND OFFICIAL  )<br>CAPACITIES.  )<br><br>DEFENDANTS  )<br> ) | C/A No.: 2:25-CV-138-KS-MTP<br><br>**COMPLAINT**<br>**(Jury Trial Demanded)** |

Comes now, the Plaintiff, Rafeal C. Joseph, and files this Complaint against the Defendants University of Southern Mississippi and Valencia Wells, as well as Defendants Omega Psi Phi Fraternity, Inc.; Nu Eta Chapter of Omega Psi Phi; Phi Rho Chapter of Omega Psi Phi Fraternity, Inc. dba Hub City Uplift Initiative, Inc.; Omega Psi Phi MS; Terry Carter, individually and as an active member of Nu Eta Chapter of Omega Psi Phi; and John Does 1-15 in their individual and official capacities (hereafter collectively "Fraternity Defendants"), and alleges as follows:

## INTRODUCTION

1.      This is a civil rights and negligence action brought by Rafeal C. Joseph as a result of injuries he suffered during pledging and initiation into the Omega Psi Phi fraternity at the University of Southern Mississippi.

2.      During his pledging process, Plaintiff was consistently hazed and beaten on numerous occasions by members of the Nu Eta Chapter of OPP, despite the University of Southern Mississippi's knowledge of hazing culture on campus and within the fraternity.

3.      On the evening of November 17, 1911, Omega Psi Phi was founded inside the Science Building (later renamed Thirkield Hall) at Howard University located in Washington, D.C.  The founders were undergraduates—Edgar Amos Love, Oscar James Cooper, and Frank Coleman.  Joining them was their faculty advisor, Ernest Everett Just.  From the initials of the Greek phrase meaning, "friendship is essential to the soul," the name Omega Psi Phi was derived.  This phrase has served as the fraternity's motto since its inception.  Manhood, Scholarship, Perseverance, and Uplift are the organization's Cardinal Principles.

4.      The acts committed against Plaintiff were negligent, reckless, dangerous, and/or humiliating to say the least.  Nothing about the beatings inflicted on Plaintiff, as part of the initiation for entry into what he thought was a brotherhood, was based on friendship.  The physical acts of being whipped like a slave and the resulting injuries were emasculating.  The mental anguish he endured was in no way uplifting.

5.      Plaintiff seeks recovery for the significant damage he suffered as a result of Defendants' violations of his civil rights and tortious conduct.

## PARTIES

6.      Plaintiff, Rafeal C. Joseph, is an adult resident citizen of Pike County Mississippi.  In or about December 2022 to April of 2023, Plaintiff was a student at the University of Southern

2

Mississippi.  During this time, Plaintiff was the victim of initiation abuse and suffered injury thereby, at the hands of individuals acting on behalf of Omega Psi Phi Fraternity, Inc. (hereinafter "Defendant OPP").

7.     Defendant University of Southern Mississippi (hereinafter "Defendant USM" "USM") is a public university created by the Mississippi legislature.  Defendant USM's main campus is situated in Hattiesburg, Mississippi, with an additional campus situated in Long Beach, Mississippi.  Defendant USM may be served through the Mississippi Attorney General's Office at P.O. Box 220, Jackson, Mississippi 39205-0220.

8.     Defendant Valencia Walls (hereinafter "Defendant Walls") is a natural person who was an employee of Defendant USM and Interim Associate Director of Defendant USM's Office of Fraternity and Sorority Life at the time of the incident. Her address is unknown at this time, but she may be served wherever she may be found.

9.     Defendant Omega Psi Phi Fraternity, Inc. ("Defendant OPP" "OPP"), is a corporation doing business in Mississippi and organized and existing under the laws of the District of Columbia, with its principal place of business in the State of Georgia, at 3951 Snapfinger Parkway, Decatur, Georgia 30035.  Opp does not have a registered agent in the State of Mississippi and therefore may be served as follows: Omega Psi Phi Fraternity, Inc., c/o Secretary of State of Mississippi, 401 Mississippi Street, Jackson, Mississippi 39201, or wherever it may be found.

10.    Defendant Nu Eta Chapter of Omega Psi Phi (hereinafter "Defendant Nu Eta" "Nu Eta"), is an undergraduate chapter of OPP under the supervision of Phi Rho.  Actions taken by Nu Eta served as a cover for the brutal initiation activities that were part of the pledge process, so named as an educational process, and conducted by some of the leaders of the local

chapter, Nu Eta may be served through Phi Rho's registered agent, Claude Clayton at 443 Woodlands Circle, Brandon, Mississippi 39047, and/or Hannah Scott Back, the Coordinator of Fraternity and Sorority Life at the University of Southern Mississippi at 118 College Drive #5008, Hattiesburg, Mississippi 39406, or wherever it may be found.

11.    Defendant Phi Rho Chapter of Omega Psi Phi Fraternity Inc. dba Hub City Uplift Initiative, Inc. (hereinafter "Defendant Phi Rho" "Phi Rho"), is a nonprofit corporation organized for charitable purposes, located in Hattiesburg, Mississippi. Defendant Phi Rho is the alumni/graduate chapter responsible for supervising and overseeing Defendant Nu Eta. Actions taken by Phi Rho served as a cover for the brutal initiation activities that were part of the pledge process, so named as an educational process, and conducted by some of the leaders of the local chapter. Phi Rho may be served through its registered agent, Claude Clayton at 443 Woodlands Circle, Brandon, Mississippi 39047, or wherever he may be found.

12.    Defendant Omega Psi Phi MS (hereinafter "Defendant OPPMS" "OPPMS"), is a nonprofit corporation organized for charitable purposes, doing business in Mississippi. Actions taken by OPPMS served as a cover for the brutal initiation activities that were part of the pledge process, so named as an educational process, and conducted by some of the leaders of the local chapter. OPPMS may be served through its registered agent, Tredrick Johnson at 113 Glenwild Trl, Canton, MS 39046, or wherever he may be found.

13.    Defendant Terry Carter (hereinafter "Defendant Carter") is a natural person, a fraternity member of OPP, a University of Southern Mississippi alumni, and Assistant Dean of Pledges of the Nu Eta Chapter at the University of Southern Mississippi at the time of the incident. Defendant Carter was one of the persons who physical and mentally tortured Rafeal

4

Joseph, claiming to perform said acts on behalf of OPP. His address is unknown at this time, but he may be served wherever he may be found.

14.     JOHN DOES 1 through 15, whose identities are unknown to Plaintiff after a diligent search and inquiry, are additional persons or entities who participated in, or authorized, or ratified the conduct and harm complained of herein, and/or who entered into and engaged in a conspiracy or common plan with the Fraternity Defendants to commit one or more tortious acts. On information and belief, one or more such Fictitious Parties and/or unknown parties are persons who reside within and are citizens of the State of Mississippi and/or attend the University of Southern Mississippi.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over the federal claims against Defendant USM and Defendant Walls pursuant to 28 U.S.C. § 1331 because those claims arise under federal law, specifically 20 U.S.C. § 1681, *et seq.* and 42 U.S.C. § 1983.

16.     This Court has subject matter jurisdiction over the claims against Defendant OPP pursuant to 28 U.S.C. § 1332(a)(1), as Plaintiff and Defendant OPP are citizens of different states and the amount in controversy exceeds $75,000.

17.     This Court has supplemental jurisdiction over the state claims against the remaining Defendants pursuant to 28 U.S.C. § 1367 because those claims arise under the same facts as those over which the Court has original jurisdiction as described in the preceding paragraphs.

18.     This Court has personal jurisdiction over Defendant OPP as it has purposefully availed itself of the privilege of conducting activities in the State of Mississippi. At all times relevant to the Complaint, Defendant OPP controlled, operated, and oversaw fraternities in the

State of Mississippi, were doing business in the State of Mississippi through such conduct, and are profiting significantly from such activities.    Additionally, at all times relevant to this Complaint, this action relates to and arises out of the contacts Defendant OPP created in the State of Mississippi.    Moreover, a substantial part of the events or omissions complained of occurred within the State of Mississippi.

19.    This Court has personal jurisdiction over the remaining Defendants as they are all residents of the State of Mississippi and a substantial part of the events or omissions complained of occurred within the State of Mississippi.

20.    Venue is proper in the Southern District of Mississippi, Hattiesburg Division pursuant to 28 U.S.C. § 1391(b)(1) & (2), as Defendant OPP has substantial contacts in Forrest County, the remaining Defendants are residents of Forrest County, and the acts or omissions complained of occurred within Forrest County.

## FACTUAL ALLEGATIONS

### HAZING AND PHYSICAL ABUSE OF PLAINTIFF

21.    This is a complaint for life-altering personal injuries arising out of a brutal and negligent fraternity initiation incident.    Plaintiff attempted to become a member, commonly referred to as "pledging," of Omega Psi Phi Fraternity, Nu Eta Chapter in Hattiesburg, Mississippi, from approximately December 2022 to April 2023.    Plaintiff was engaged in the required orientation and membership intake process to initiate prospective membership into the Nu Eta Chapter of Omega Psi Phi Fraternity.

22.    Plaintiff enrolled at the University of Southern Mississippi in the fall semester of 2020.    Along with being a lifelong Golden Eagle, Plaintiff zealously wished to be a lifelong member of a Greek Fraternity organization on the Southern Miss campus.

6

23.    Plaintiff expressed his desire and applied to become a member of Omega Psi Phi Fraternity, Inc. (generally "Que Dogs"), through its local chapter at the university, Nu Eta, and overseen by the alumni chapter, Phi Rho Chapter – Omega Psi Phi.  At all times relevant, the local chapter at issue in this case resided in Hattiesburg, Forrest County, Mississippi.

24.    In addition to Phi Rho's oversight, Defendant OPP was also responsible for supervising the activities of Nu Eta chapter, promulgating rules and regulations for its chapters, and enforcing such rules and regulations.

25.    Defendant Terry Carter was an active member in the fraternity and Nu Eta during the 2023 pledge season.  Defendant Carter was also the Assistant Dean of Pledges, the person who assisted with overseeing the membership intake process.  Upon information and belief, Defendant Carter had been involved in prior instances hazing within Nu Eta.

26.    While pledging did not officially start until January 2023, Plaintiff and other prospective members began unofficially pledging OPP in December 2022.

27.    From the outset, Plaintiff was required to follow certain "rules" as an OPP pledge, including that he could not walk on the grass and could not be on campus too long.  Plaintiff was also required to perform tasks, such as giving rides to OPP members to and from campus.

28.    Sometime in December 2022, OPP pledges and members met up in the library to have the "haze talk."  During this talk, OPP members explained everything that was going to happen to OPP pledges, including that "you're going to get your ass whooped."

29.    Thereafter, OPP members began hazing pledges, including Plaintiff, in December of 2022.  Such hazing took the form of taking money and food from pledges, intimidating pledges, causing sleep deprivation to pledges, threatening pledges with physical abuse, and severely beating pledges.

30.     Plaintiff was beaten numerous times by OPP members from December 2022 until April 2023, both on and off Defendant USM's campus, with many such beatings involving the use of a 2x4 cut into the shape of a paddle.

31.     As a result of the continued and extreme physical abuse Plaintiff endured, he had to be rushed to the emergency room on two occasions, April 14, 2023, and April 16, 2023. Notably, however, OPP members did not assist Plaintiff or otherwise arrange for him to receive medical treatment on either occasion.

32.     As part of its history and traditions, Nu Eta chapter of OPP planned, promoted, and engaged in an initiation ritual known as "Hell Night," in which pledges were required, as a condition of membership into the fraternity, to allow OPP members to beat them with the wooden paddle.

33.     On April 16, 2023, as part of "Hell Night," Plaintiff and other pledges were blindfolded and rendered helpless before being subjected to abuse by OPP members. Thereafter, OPP members, including Defendant Carter, struck Plaintiff repeatedly with the wooden paddle.

34.     Following the severe beating he received on April 16, 2023, Plaintiff was admitted to the emergency room and diagnosed with bruised ribs, right intramuscular hematoma buttocks, rhabdomyolysis, posterior compartment syndrome, and underwent a blood transfusion and an emergency surgery.







 

35.    Plaintiff's medical records also note that he could not walk as a result of his injuries and spent nearly eleven days in the hospital, being discharged on April 26, 2023.

36.    Upon information and belief, Defendant Walls, the Interim Associate Director of Defendant USM's Office of Fraternity and Sorority Life, was aware of the hazing occurring within OPP.

37.    In the Fall of 2022, a student pledging OPP was beaten so severely that he suffered a torn ACL and required crutches to participate in his probate ceremony.

38.    Upon information and belief, Defendant USM did not investigate or otherwise address the hazing related injuries suffered by this student.

39.    At some point during the Spring of 2023, Defendant Walls reached out to OPP to inform them that if "someone else" was hurt or injured during the pledging process, OPP would be suspended.

40.    Following Plaintiff's hospitalization, Defendant Walls reached out to OPP to warn them not to let Plaintiff attend his probate ceremony on crutches, indicating that Defendant USM "didn't want to see that."    Defendant Walls further indicated that if OPP allowed Plaintiff to attend his probate ceremony on crutches, OPP would be suspended.

41.    Despite these warnings, Plaintiff made a point to ensure that Defendant Walls saw the condition he was in and the injuries he suffered.

42.    However, following these incidents and Plaintiff's injuries, no one from Defendant USM, including Defendant Walls, reached out to Plaintiff or otherwise attempted to offer him any services.

43.    Since these heinous acts, Plaintiff's life has changed drastically.    Plaintiff could not participate in his probate "coming out" ceremony.    Plaintiff was quickly ousted from the organization and started receiving messages asking him to cover up certain details of their internal rituals process that he unfortunately had to endure.

44.    Plaintiff attempted to return to USM the following semester, Fall 2023.    However, he was unable to walk and, due to the severe emotional distress and threats, Plaintiff's grades dropped.    He had to drop out of college and remove himself from that setting.

45.    Plaintiff sought treatment with various providers and ultimately had to relearn how to walk and adapt to never being able to fulfill his lifelong dreams of being a Southern Miss Golden Eagle Alumni and an accepted member of Omega Psi Phi.

11

## USM's PARTNERSHIP WITH AND CONTROL OF GREEK LIFE

46.    Defendant USM requires fraternities to register as official student organizations at USM and to cooperate with USM to support the improvement of education in ways that do not interfere with the administration of the University.

47.    Defendant USM exercises substantial control over Greek Life by promoting, supporting, and undertaking other obligations to register and monitor fraternities and sororities, including through an Office of Fraternity and Sorority Life utilizing paid staff and volunteers.

48.    As part of the substantial control Defendant USM exercises over its registered fraternities and sororities, USM has the ability and authority to establish rules regarding the recruitment, rush, pledge, and initiation processes of each of its registered fraternities and sororities, including which USM students are eligible to pledge a registered fraternity, the permitted length of time for the pledge process for registered fraternities, and whether registered fraternities are permitted to require prospective members to complete a pledge process as a prerequisite for admission into the fraternities.

49.    Defendant USM promotes registered fraternities, and the educational benefits and opportunities they provide, on the USM website.

50.    Among other promotional statements by Defendant USM regarding Greek Life, USM states:

     a.    "Fraternity and sorority membership provides opportunities for personal growth, intellectual development, and social connection throughout college and beyond. Students who become part of our community will be exposed to a well-rounded, co-curricular experience. Membership in one of our 26 organizations offers opportunities that will enhance the student experience."

12

b. "Every year, our chapters raise thousands of dollars and perform hundreds of hours of community service that benefit local and national philanthropic organizations."

c. "Members of fraternities and sororities can be found leading organizations all over campus. They are involved in the classroom, in student organizations, and the greater Hattiesburg community."

d. "The Southern Miss fraternity and sorority community consistently maintains a higher cumulative GPA than their unaffiliated undergraduate counterparts."

e. "Membership in one of our organizations offers the opportunity for connection and belonging. We believe that fraternity and sorority membership can make a large campus feel a little smaller."

f. "Our community consistently earn higher GPAs than their unaffiliated counterparts. Involvement in Fraternity and Sorority Life provides students with a support system to help them reach their academic goals. Each organization holds its members accountable to a high academic standard and offers resources when classes get challenging."

51.    In promoting the educational program and benefits of fraternity membership, which are only available to male students, Defendant USM states as fact only positive, promotional information to encourage male student participation.

52.    Upon information and belief, Defendant USM made a conscious decision to withhold from current, incoming, and prospective male students, and their families, information about severe, pervasive, and objectively offensive incidents of dangerous hazing and harm,

including coerced, excessive consumption of alcohol and physical beatings, within USM-recognized fraternities.

53.    Defendant USM had actual knowledge that Defendant OPP had engaged in severe, pervasive, and objectively offensive hazing, yet it acted with deliberate indifference by excluding this truthful, accurate information from its promotional materials on Greek Life to leave current, incoming, and prospective male students and their families ignorant of the known risks.

54.    Upon information and belief, as a result of long-held, outdated, and archaic gender stereotypes about men, Defendant USM has a policy and practice of responding with deliberate indifference to allegations of hazing of male students and aggressively and appropriately to allegations of hazing of female students in USM Greek Life.

55.    As a result of Defendant USM's policy and practice of responding differently to reports of hazing involving male students relative to those involving female students, male students seeking educational opportunities and benefits through USM Greek Life face a risk of serious injury and death as a result of hazing not faced by female students seeking those same educational opportunities and benefits.

56.    The serious risk of injury and death facing male students seeking educational opportunities and benefits through USM Greek Life interferes with male students' ability to benefit from and fully participate in the educational programs, activities, and services of USM Greek Life as a result of their gender.

57.    Defendant USM has established policies concerning hazing. Defendant USM defines hazing as follows:

> Any willful act or requirement by a student or organization directed against an individual that with or without intent

- is likely to cause bodily harm or danger, injury, physical punishment, or disturbing pain;
- is likely to compromise the dignity of a person, cause embarrassment, shame, malicious ridicule, psychological harm, or substantial emotional strain;
- would reasonably impair a person's academic efforts;
- compels a person to participate in illegal or immoral behavior or behaviors that are contrary to any University policies or state laws.

58.     Defendant USM's policies provide specific examples of hazing, including:

a.  Emotionally or psychologically abusive or demeaning behavior;

b.  Acts that could result in physical, psychological, or emotional deprivation, shock, or harm;

c.  Physical abuse, e.g., whipping, paddling, beating, tattooing, branding, and exposure to the elements, or the threat of such behaviors;

d.  Morally degrading or humiliating games and activities.

59.     Defendant USM's policies also cite Mississippi's hazing law, Miss. Code § 97-3-105.

## KNOWN, PERVASIVE, AND DISREGARDED RISKS TO MALE STUDENTS AT USM FRATERNITIES

60.     Upon information and belief, in the years preceding the assaults against Plaintiff, numerous fraternities violated Defendant USM's rules, policies, and codes of conduct.

61.     Notably, Defendant USM does not have a formal or public record detailing instances of hazing misconduct on campus or against students seeking membership in a fraternity.

62.     However, several incidents involving fraternity hazing which resulted in significant harm have become public, including:

a. In 2008, the USM Kappa Sigma fraternity had its charter revoked after its members conducted an initiation ritual for members of its little sister organization which resulted in two young women being taken to the hospital, one of which had a life-threatening blood-alcohol level of .47 percent. Following the incident, Defendant USM was initially hesitant to act, but ultimately pursued disciplinary action after the incident became widely reported.

b. In 2010, the USM Sigma Phi Epsilon fraternity was suspended after failing to cooperate with a beating investigation. The suspension came after the fraternity had previously violated rules related to hazing, including bullying, harassment, and alcohol violations. Notably, while Defendant USM merely suspended the fraternity, the National Sigma Phi Epsilon organization revoked the chapter's charter.

c. In 2014, the USM Pi Kappa Alpha fraternity was indefinitely suspended after an initiation rite led to the death of two flamingoes. The Pi Kappa Alpha pledges were tasked with going to the local zoo, in the middle of the night and after zoo hours, and taking pictures with a swan. However, one of the pledges took a flamingo from the zoo and brought it back to the chapter's fraternity house. The flamingo ultimately had to be euthanized and a second flamingo died from injuries incurred trying to defend its mate. The USM Pi Kappa Alpha chapter was ultimately allowed to return to campus in 2017.

d. In December 2018, USM, in consultation with Sigma Chi International, placed the USM Sigma Chi fraternity on an action plan and evicted them from their house as a result of hazing violations. However, police incident reports demonstrated that

USM officials were aware that the fraternity was engaging in hazing months before USM took action. In a September 22, 2018 incident report, campus police saw pledge conduct violating USM's hazing policy at a USM football game. According to the reports by campus police, the USM Assistant Vice President for Student Life and the USM Vice President for Student Affairs were both aware of the conduct and asked to meet with law enforcement about the same in October 2018. About a week prior to the football game hazing, campus police stumbled upon a ritual meeting in the Sigma Chi house. On September 16, 2018, officers arrived at the Sigma Chi house to conduct a security check and noticed a black sheet over the front door with a sign reading "Ritual in Progress." When officers walked into the front room of the house, they noticed that it had been ransacked, with broken glass, beer cans, clothes on the floor, food, vomit, emptied trash cans, and blood on the floor. They also found blood and blood covered tissue in the men's restroom. On another occasion, on May 20, 2016, campus police conducted a walk-through of the Sigma Chi house and noticed the odor of marijuana. Upon locating the source, police found someone with bloodshot eyes. When police inquired about his condition, he revealed that he had been up for forty-eight (48) hours due to fraternity initiation. In addition to these hazing incidents, USM Sigma Chi was also cited for numerous alcohol, drug, and weapons violations dating back to 2013. Upon information and belief, USM Sigma Chi was allowed to return to campus in 2024.

e. As mentioned above, in 2022, members of USM Omega Psi Phi fraternity beat a pledge so severely that he suffered a torn ACL and was forced to participate in his

probate while on crutches. However, upon information and belief, no investigation was launched against the fraternity and the fraternity suffered no consequences as a result.

63. Upon information and belief, there are additional incidents of dangerous hazing, resulting in severe injuries to male students seeking educational benefits and opportunities through Greek Life, which are known to Defendant USM but neither publicly disclosed nor made part of the Greek Life information Defendant USM provides current, incoming, and prospective male students and their families.

64. Upon information and belief, sororities at Defendant USM do not have a culture or documented history of dangerous hazing and misconduct, and female students seeking similar, valuable educational benefits through membership in USM-recognized sororities do not face serious risks of injury or death by hazing or other misconduct.

65. Upon information and belief, the severity with which Defendant USM responds to reports of alleged hazing of female students in sororities is the result of long-held, outdated gender stereotypes about men which have fostered a policy and practice at Defendant USM of treating the hazing of male students differently than the hazing of female students. In particular, under Defendant USM's long-standing policy and practice, the hazing of females is appropriately treated as unacceptable while the hazing of males is minimized as "boys being boys" engaged in masculine rites of passage.

66. Upon information and belief, as a result of these long-held gender stereotypes, Defendant USM, as a matter of policy and practice, has responded to and punished allegations of dangerous and life-threatening hazing of male students in fraternities significantly less seriously

and severely than it has responded and punished non-life-threatening hazing of female students in sororities.

67.    Further, for years Defendant USM has remained deliberately indifferent to the serious and substantial risks male students face in seeking the educational opportunities and benefits of USM Greek Life, and has refused and failed to make any material changes to the manner in which it recognizes, promotes, regulates, manages, and sanctions USM fraternities, leaving them unsafe and imposing serious and substantial risk to male students seeking the educational benefits and opportunity touted by Defendant USM.

68.    For years, Defendant USM has remained deliberately indifferent to the serious and substantial risks male students face in seeking the educational opportunities and benefits of USM Greek Life, and has decided against advising current, incoming, and prospective male students and their families of these serious and substantial risks as a means of reforming fraternities or providing male students with the information necessary to understand the serious and substantial risks and protect themselves.

69.    For years, Defendant USM has refused and failed to take necessary and effective corrective action to address the serious and substantial risks faced by male students seeking educational benefits and opportunities through Greek Life, thereby permitting a hostile educational environment for male students seeking the educational benefits and opportunities of Greek Life to exist and persist.

70.    For years, Defendant USM, through its official policy and practice of treating hazing of male students substantially less seriously and harshly than hazing of female students, has discriminated against male students seeking the educational opportunities and benefits of Greek Life touted by Defendant USM, in violation of Title IX.

## OMEGA PSI PHI'S HISTORY OF HAZING

71.    Omega Psi Phi has a long and documented history of hazing incidents, resulting in serious injuries to prospective members. This history shows that this is the manner in which OPP conducts their initiations. Every member is not always harmed or injured, but the organization has created a dangerous environment for desired members, and when the process is recklessly or negligently conducted, severe injuries have occurred. OPP's history includes, but is not limited to, the following incidents:

**1999:** A Kentucky jury found in favor of a former University of Louisville student who was badly beaten with a wooden paddle by members of Omega Psi Phi during a hazing incident. This case demonstrates that Omega Psi Phi's use of a wooden paddle during hazing activities, which resulted in Plaintiff's injuries, has been a known and dangerous practice for over two decades.

**2009:** The University of Houston suspended the Omega Theta Chapter of Omega Psi Phi after a pledge was beaten with paddles, a broomstick, a baseball bat, and an antenna which resulted in the student requiring emergency medical attention. This incident is yet another example of and Omega Psi Phi chapter beating prospective members with objects, including paddles, resulting in severe injury.

**2015:** Johnson C. Smith University banned the Rho Chapter of Omega Psi Phi from campus after a prospective member was a victim of hazing for several months. Such hazing included multiple instances in which the student was beaten with a paddle, one of which resulted in hospitalization. This incident again demonstrates widespread practice of Omega Psi Phi chapters beating pledges with paddles which oftentimes results in hospitalization.

20

**2015:** Saginaw Valley State University indefinitely suspended its Omega Psi Phi chapter after reports that a student suffered injuries after roughly a month of hazing. Such hazing included members beating the student with open hands about the torso and/or a wooden paddle on the buttocks. The student ultimately lost consciousness and ended up in the hospital, where he did not recognize his family, had impaired speech, and was barely able to walk. This incident demonstrates the widespread practice among Omega Psi Phi chapters of beating pledges, including with a wooden paddle, which often results in significant injury and need for medical attention.

**2016:** Louisiana State University rescinded the registration of the Theta Kappa Chapter of Omega Psi Phi until 2019 after determining the fraternity was complicit in hazing of candidates and engaged in an "underground" pledging process that resulted in endangering the safety and well-being of LSU students.

**2018:** An initiate into a graduate chapter of Omega Psi Phi in Brooklyn, New York was allegedly struck 200 times with a paddle and bare hands during a membership ritual. This incident required the initiate's hospitalization, highlighting the extreme and life-threatening nature of Omega Psi Phi's hazing rituals. This incident demonstrates that Omega Psi Phi's widespread practice of beating initiates, including with a paddle, is not limited to its undergraduate chapters.

**2019:** Old Dominion University suspended the Tau Lambda Chapter of Omega Psi Phi from campus for five years due to reports from multiple potential members that they had been pushed, shoved, and bruised by paddling or

open-handed slaps during hazing activities. This suspension reflects the serious and pervasive nature of hazing within Omega Psi Phi and the organization's failure to adequately address and prevent such conduct.

**Fall 2022:** At the University of Southern Mississippi, an initiate named Darius Sharkey was beaten so severely during hazing activities that he required crutches during his probate ceremony. This incident occurred at the same university and within the same chapter as Plaintiff's hazing, demonstrating that the Nu Eta Chapter of Omega Psi Phi has a recent and established practice of engaging in reckless patterned violent and dangerous hazing rituals.

**2024:** Dartmouth College suspended the Theta Beta Beta Chapter of Omega Psi Phi until 2028 after a prospective member was beaten with a wooden paddle during an initiation rite for pledges. The student was taken to the emergency room with visible injuries. This incident is yet another example of an Omega Psi Phi chapter subjecting prospective members to severe physical abuse, including with a wooden paddle, which often times results in significant injury.

**2025:** At Southern University, a 20-year-old prospective member died as a result of injuries suffered during an off-campus Omega Psi Phi hazing ritual. The student was punched in the chest multiple times before having a seizure and falling to the ground. No members of the fraternity attempted to call 911 or summon an ambulance. Rather, the members changed the student's clothes and dropped him off at a hospital emergency department, telling medical staff that he collapsed while playing basketball. This incident reveals that the practice of

subjecting prospective members to severe physical abuse continues unabated within Omega Psi Phi chapters and often leads to severe consequences.

72.     These incidents, which are only a fraction of the reported/known cases, illustrate a pattern of reckless and dangerous behavior within Omega Psi Phi that has persisted for decades.

73.     Despite numerous lawsuits, suspensions, and public outcry, Omega Psi Phi has failed to implement effective measures to prevent negligent hazing and protect the safety of its prospective members.  This repeated failure to address the issue of hazing shows a reckless disregard to the well-being of initiates and a disregard for the law.

74.     In addition, these incidents are just a few of the horrible instances involving the infamous Omega Psi Phi wooden paddle that resulted in severe injury and humiliation to young men seeking to be a part of this supposed brotherhood.

75.     The "Omega wooden paddle" or "Que wooden paddle" is so synonymous with Omega Psi Phi and their reckless initiation process that these acts committed, though intentional, are foreseeable when a negligent/reckless process is conducted, and each Defendant was on notice of the dangerous nature of the rituals and history of their beloved fraternity.

76.     As a result of these acts, the Fraternity Defendants are liable to Plaintiff for the torts of negligence, recklessness, negligent infliction of emotional distress, negligence per se, gross negligence, and civil conspiracy.

77.     The acts and omissions of the Defendants have damaged Plaintiff in an amount to be proven at trial for actual, economic, and compensatory damages, in addition to attorney fees and punitive and extra contractual damages.

**OMEGA PSI PHI AND USM EACH EMPOWER AND PERMIT UNDERGRADUATE MALES TO CONTROL THE INTITIATION AND MEMBERSHIP PROCESSES AT OMEGA PSI PHI – NU ETA**

78.     Defendant OPP and Defendant USM both establish and otherwise control the processes and procedures whereby male students become fraternity members through recruitment, pledging, and initiation, and empower chapter officers to conduct and oversee these processes and procedures.

79.     In managing and controlling Defendant Nu Eta chapter and its other chapters and members, Defendant OPP, *inter alia*, promulgates risk management policies which are applicable to all chapters and members, and which purportedly prohibit hazing.

80.     Defendant OPP and Defendant USM each had, at all times relevant to the Complaint, access to and specialized knowledge of information, research, campus judiciary proceedings, and other credible information confirming a staggering number of serious risk management violations and injuries from fraternity, not sorority, activities.

81.     Fraternity members, many of whom are entirely untrained, often intoxicated, and influenced by traditions and rituals passed down through their chapters, are empowered, trusted, and principally relied upon by Defendant OPP and Defendant USM to implement their risk-management and anti-hazing rules and policies, promote the national fraternity and Greek Life at USM, recruit new members and revenue for Defendant OPP, and make life and death decisions.

82.     For years, Defendant OPP and Defendant USM have remained deliberately indifferent to the serious and substantial risks to male students seeking the educational opportunities and benefits of Greek Life touted by Defendant USM and Defendant OPP, and they have failed to act reasonably to protect male students and make recruitment, pledging, initiation,

24

and other fraternity activities safe for male students. The management structures created and sanctioned by Defendant OPP and Defendant USM have consistently proven ineffective and dangerous for male students.

83.    Despite such knowledge, Defendant OPP and Defendant USM each decided against making any material change to the way fraternity activities, recruitment, and pledging at Defendant USM, and at Nu Eta chapter specifically, are conducted in order to render recruitment, pledging, and fraternity membership safe for male students. Instead, Defendant OPP and Defendant USM each continued to promote and condone a structure of self-management by undergraduate fraternity members, including a policy of tolerance regarding dangerous misconduct despite the long history demonstrating the dangers of these management models and the need for change.

## FOR A FIRST CAUSE OF ACTION
## VIOLATION OF TITLE IX, 20 U.S.C. § 1681, *et seq.*
### (*against Defendant USM*)

84.    Plaintiff repeats and realleges the factual allegations contained in paragraphs 1–70 and 78-83 as if fully restated herein.

85.    Defendant USM is a recipient of federal funds within the meaning of 20 U.S.C. § 1681(a).

86.    At all times relevant to this Complaint, Defendant USM, through its employees and administrators responsible for overseeing the fraternity and sorority system at USM, including the Office of the Dean of Students of USM which oversees the Division of Student Affairs and Enrollment Management and Office of Fraternity and Sorority Life, exercised substantial control over its registered fraternities in the fraternity and sorority system, including Defendant OPP, and the recruitment, pledging, and initiation of its registered fraternities.

87.    For years, Defendant USM, through its employees and administrators responsible for overseeing the fraternity and sorority system at USM, had actual knowledge of serious and substantial risks facing male students seeking access to educational opportunities and benefits USM provided through Greek Life, as a result of dangerous, repeated misconduct, including hazing involving, among other things, severe physical beatings, within and exclusive to the fraternity system, prior to Plaintiff pledging Defendant OPP, the hazing of Plaintiff, and his severe injuries.

88.    Defendant USM, through its employees and administrators, was responsible for overseeing the fraternity and sorority system at USM, had actual knowledge of dangerous, repeated misconduct, including hazing of male students involving, among other things, severe physical beatings, by Defendant OPP and its members prior to Plaintiff pledging OPP, the hazing of Plaintiff, and the severe injuries suffered by Plaintiff.

89.    Upon information and belief, Defendant USM, through its employees and administrators responsible for overseeing the fraternity and sorority system at USM, responds with deliberate indifference to the allegations of hazing male students seeking educational benefits and opportunities through USM Greek Life, including male students pledging OPP, because of long-held and outdated gender stereotypes about young men.

90.    Upon information and belief, because of those long-held and outdated gender stereotypes about young men, Defendant USM, through its employees and administrators responsible for overseeing the fraternity and sorority system at USM, has a policy and practice of treating the hazing of male students significantly less seriously than the hazing of female students, minimizing the hazing of males as "boys being boys" engaged in masculine rites of passage.

91.    Through its policy and practice, Defendant USM has persisted in a systemic, intentional, differential treatment of male student seeking educational opportunities and benefits through USM Greek Life and, therefore, has discriminated against male students in violation of Title IX.

92.    As a result of Defendant USM's policy and practice of treating the hazing of male students significantly less seriously than the hazing of female students, male students seeking to access the educational opportunities and benefits USM provided through Greek Life face serious and substantial risks of injury and death as a result of hazing involving, among other things, severe physical beatings, while female students seeking similar educational benefits and opportunities did not face the same serious or substantial risks.

93.    Further, Defendant USM, through its employees and administrators responsible for overseeing the fraternity and sorority system at USM, permitted, supported, promoted, and provided funding for a fraternity and sorority system that, without proper oversight, encouraged young men to engage in hazing, harassment, and violence against male students seeking educational opportunities and benefits through Greek Life.

94.    Defendant USM failed to provide adequate training or guidance to its employees and administrators responsible for overseeing the fraternity and sorority system at USM, even though USM was on actual notice that such training and guidance were necessary to implement proper controls over the Greek Life fraternity system and to prevent and discourage hazing against male students seeking educational opportunities and benefits through USM Greek Life.

95.    By its discriminatory policy and practice of treating hazing of male students significantly less seriously than hazing of female students and its deliberate indifference, through conscious and reckless actions and inactions, Defendant USM created a discriminatory, hostile

27

environment in which hazing against male students seeking educational opportunities and benefits through USM Greek Life was pervasive and posed serious risks of injury and death to those male students, including Plaintiff.

96.    Defendant USM, through its employees and administrators responsible for overseeing the fraternity and sorority system at USM, had the authority to directly investigate and take meaningful corrective action to end the hazing threatening male students within USM Greek Life, and to provide male students equal access to those educational benefits and opportunities without facing serious risk of injury or death.  Despite this, Defendant USM consciously, recklessly, and deliberately failed to do so.

97.    Defendant USM, through its employees and administrators responsible for overseeing the fraternity and sorority system at USM, had the authority to directly investigate and take meaningful corrective action to end the hazing threatening male students within USM Greek Life, and to provide male students equal access to these educational opportunities and benefits without facing serious risks of injury and death, but instead, upon information and belief, as a matter of policy and practice, remained deliberately indifferent to the severe and pervasive risks of serious injury and death faced by male students, and treated hazing of males significantly less seriously than hazing of females, thereby permitting hazing of males in USM Greek Life to exist and persist.

98.    Through its official policy and practice of remaining deliberately indifferent to the severe and pervasive risks of serious injury and death faced by male students attempting to access the educational opportunities and benefits provide through USM Greek Life, including Plaintiff, and of treating hazing of males significantly less seriously than hazing of females,

Defendant USM discriminated against male students, including Plaintiff, in violation of the requirements of Title IX.

99.    Plaintiff suffered egregious hazing, intimidation, and severe, life-altering injuries as he sought educational opportunities and benefits through USM Greek Life in circumstances not faced by female students seeking the same educational opportunities and benefits.

100.    As a direct and proximate result of Defendant USM's discriminatory actions, inactions, policies, and practices, and deliberate indifference, in violation of the requirements of Title IX, Plaintiff was hazed and endured great physical and mental pain and suffering.

**FOR A SECOND CAUSE OF ACTION**
**VIOLATION OF SUBSTANTIVE DUE PROCESS RIGHTS TO EDUCATION**
**AND BODILY INTEGRITY IN VIOLATION OF THE FOURTEENTH AMENDMENT**
***(against Defendant Walls)***

101.    Plaintiff repeats and realleges the factual allegations contained in paragraphs 1–45 as if fully restated herein.

102.    This action is brought against Defendant Walls in her individual capacity, pursuant to the Fourteenth Amendment to the United States Constitution, for Defendant Walls's violations of 42 U.S.C. § 1983.

103.    At all times relevant to this Complaint, Defendant Walls, as Interim Associate Director of Defendant USM's Office of Fraternity and Sorority Life, was an employe and/or agent of Defendant USM and acting within the course and scope of her employment, under color of state law, to wit, under color of the statutes, ordinances, regulations, policies, customs, and usages of Defendant USM.

104.    The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV, § 1.

105.    At all times relevant to this Complaint, the Fourteenth Amendment to the United States Constitution has protected an individual's right to be free from governmental action that "shocks the conscious" and deprives a person of judicial protection to redress wrongful government conduct.

106.    Additionally, the Fourteenth Amendment protects an individual's right to education, security, and safety in their bodily integrity. *See Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 451-52 (5th Cir. 1994).

107.    The Fourteenth Amendment also operates to prevent a person from enduring bodily harm imposed by governmental entities, and from being foreclosed against seeking redress for that harm.

108.    At all times relevant to this Complaint, Defendant Walls had a duty to supervise and monitor USM fraternities, and/or to prevent, investigate, and remediate misconduct within fraternities.

109.    At all times relevant to this Complaint, Defendant USM had policies in place related to the prevention, investigation, and correction of hazing and Defendant Walls, as Interim Associate Director of Defendant USM's Office of Fraternity and Sorority Life, was responsible for enforcement of these policies and procedures.  The failure of Defendant Walls regarding these policies and procedures amounts to deliberate indifference and the complete absence of care.

110.    Defendant Walls's failure to comply with the administrative requirements of Title IX, as well as USM's Title IX and hazing policies, deprived Plaintiff of his substantive due process rights to liberty, education, and bodily integrity.

111.    Reasonable officials in Defendant Walls's position would have known of Plaintiff's substantive due process rights under the law.

112.    Defendant Walls had actual knowledge that Defendant OPP was hazing pledges and subjecting them to severe physical beatings resulting in significant injury and yet failed to report, supervise, investigate, coordinate, notify law enforcement, or otherwise act in response to reports of Defendant OPP's conduct.  To the contrary, despite knowledge of prior similar incidents, Defendant Walls worked with Defendant OPP to hide the severe harm caused to Plaintiff and help Defendant OPP avoid discipline for the harm caused to Plaintiff.

113.    Plaintiff had clearly established rights to education and bodily integrity at the time of Defendant Walls's malfeasance.

114.    As an individual charged with overseeing, supervising, and monitoring USM Greek Life, it would be unreasonable to conclude that Defendant Walls did not know the failure to prevent, investigate, and report hazing and physical violence deprived students, including Plaintiff, of his rights to education and bodily integrity.

115.    Defendant Walls's actions violated clearly established Constitutional law.

116.    Defendant Walls's conduct and failures have created an unknown number of victims of hazing perpetrated by USM fraternities.

117.    These failures and the harm shock the conscience.

118.    As a direct and proximate of Defendant Walls's acts and omissions, Plaintiff has sustained injuries and damages, including, but not limited to, physical and emotional injuries, loss of his fundamental constitutional rights, economic loss, mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment, educational loss, economic loss, psychological damage, and loss of the ordinary pleasures of everyday life.

31

119.    As such, Defendant Walls is liable to Plaintiff for deprivation of Plaintiff's Constitutional rights to due process, education, and bodily integrity.

**FOR A THIRD CAUSE OF ACTION**
**VIOLATION OF SUBSTANTIVE DUE PROCESS RIGHTS TO EDUCATION**
**AND BODILY INTEGRITY IN VIOLATION OF THE FOURTEENTH AMENDMENT**
**AND MONELL V. DEPARTMENT OF SOCIAL SERVICES OF CITY OF NEW YORK**
*(against Defendant USM)*

120.    Plaintiff repeats and realleges the factual allegations contained in paragraphs 1–70 and 78-100 as if fully restated herein.

121.    This action is brought against Defendant USM pursuant to the Fourteenth Amendment to the United States Constitution, for Defendant USM's violations of 42 U.S.C. § 1983.

122.    At all times relevant to this Complaint, the Fourteenth Amendment to the United States Constitution has protected an individual's right to be free from governmental action that "shocks the conscious" and deprives a person of judicial protection to redress wrongful government conduct.

123.    The Fourteenth Amendment also operates to prevent a person from enduring bodily harm imposed by governmental entities, and from being foreclosed against seeking redress for that harm.

124.    Under the Fourteenth Amendment, the State is precluded not only from inflicting harm itself, but also from taking affirmative acts that directly increase the likelihood of harm perpetuated by third parties.

125.    Additionally, the Fourteenth Amendment protects an individual's right to education, security, and safety in their bodily integrity. *See Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 451-52 (5th Cir. 1994).

32

126. Plaintiff was deprived of these rights by Defendant USM despite Defendant USM maintaining policies that should protect students like Plaintiff.

127. Defendant USM maintained and maintains policies related to Title IX and hazing.

128. However, with respect to the harm perpetuated upon Plaintiff, Defendant USM created and increased the likelihood of harm to Plaintiff by failing to implement appropriate Title IX and hazing policies, failing to adequately train its employees on such policies, failing to supervise its employees, failing to investigate instances of hazing occurring within USM fraternities, and failing to remediate deficiencies in its policies, training, and/or conduct regarding Title IX and hazing, and/or engaging in a pattern and practice of deliberate indifference to hazing of male students.

129. At all relevant times, Defendant USM had knowledge of the risks of hazing within the fraternity system and the risks of failing to investigate such conduct, failing to implement appropriate policies to deter such conduct, and failing to train its employees to respond to such conduct.

130. Defendant USM's deliberate indifference to the risk of hazing and student-on-student violence within fraternities is demonstrated by:

   a. Defendant USM's tolerance of hazing activities occurring within fraternities as "boys being boys";

   b. Defendant USM's hesitance to investigate or address instances of hazing occurring within its fraternities;

   c. Defendant USM's willingness to allow fraternities to engage in multiple instances of hazing before subjecting them to any sort of consequences;

    d. Defendant USM's failure to investigate reports of hazing occurring within fraternities;

    e. Defendant USM's failure to implement appropriate policies regarding Title IX and hazing;

    f. Defendant USM's failure to train its employees on investigating and/or appropriately responding to instances of hazing within fraternities;

    g. Defendant USM's failure to supervise its employees;

    h. The failure of USM employees, including Defendant Walls, to take appropriate action regarding known instances of hazing; and

    i. The affirmative conduct of USM employees, including Defendant Walls, to cover up and/or conceal instances of hazing occurring within USM fraternities.

131. These patterns and practices of Defendant USM demonstrate an unofficial custom or policy of deliberate indifference to hazing and/or violence within USM fraternities.

132. Defendant USM's affirmative acts created and/or increased the risk that Plaintiff would be exposed to hazing and violence through his participation in the fraternity system.

133. Defendant USM's conduct created a special danger to Plaintiff by placing him at an increased risk for the exact harm that was eventually perpetrated against him.

134. Defendant USM objectively acted in a manner to permit and condone hazing of fraternity pledges, including Plaintiff.

135. Defendant USM's conduct was objectively and subjectively unreasonable.

136. Defendant USM's actions, which enabled fraternities like Defendant OPP to consistently engage in hazing and violence as a part of the membership process, caused Plaintiff

serious and devastating violations of his bodily integrity; significant and permanent bodily, emotional, and financial harm; and were so egregious as to shock the conscience.

137.    As a direct and proximate result of Defendant USM's acts and omissions, Plaintiff has sustained injuries and damages, including, but not limited to, physical and emotional injuries; loss of his fundamental constitutional rights; mental and emotional distress, including anxiety, mental anguish, humiliation and embarrassment; educational loss; economic loss and other incidental expenses; loss of future earning capacity; psychological damage; and loss of the ordinary pleasures of everyday life.

138.    Plaintiff therefore seeks a judgment for damages directly and proximately resulting from the conduct set forth herein, and for such additional damages as this court may determine.

**FOR A FOURTH CAUSE OF ACTION**
**NEGLIGENCE**
***(against the Fraternity Defendants)***

139.    Plaintiff repeats and realleges the factual allegations contained in paragraphs 1–45 and 71-83 as if fully restated herein.

140.    The Fraternity Defendants had a duty to exercise reasonable care not to harm Plaintiff.

141.    Defendant Phi Rho Graduate Chapter sponsors and extensively regulates the activities of the initiates into Nu Eta.

142.    Phi Rho deliberately ignored prior conduct by Carter and Nu Eta that was not in accordance with the Fraternity's standards, but in accordance with the dangerous environment created through the history and rituals of OPP.  Phi Rho negligently failed to enforce its own

rules and regulations against Carter, who was allowed to maintain his membership with the fraternity up to and including the time of the initiation events giving rise to this case.

143.   Defendant Phi Rho and Defendant OPP had a duty of care to Plaintiff because Defendant Phi Rho and Defendant OPP had the means and ability to supervise the conduct of Defendant Nu Eta and Defendant Carter but neglected to effectively do so.   Defendant Phi Rho and Defendant OPP's negligent failure to supervise the Fraternity Defendants exposed Plaintiff to an unreasonable risk of harm.   Defendant Phi Rho and Defendant OPP's failure to properly exercise its duty of care was the direct and proximate cause of Plaintiff's injuries.

144.   Defendants OPP, OPPMS, Phi Rho, and Nu Eta were negligent and breached the duty of care owed to Plaintiff as follows:

     a.   Failing to change dangerous initiation rituals being undertaken by local chapters, including Phi Rho, which involved dangerous, harassing, or emotional activities;

     b.   Failing to adequately train members regarding Defendant OPP's policies;

     c.   Failing to have appropriate procedures and standards in place to enforce the policies;

     d.   Failing to have appropriate procedures to ensure that its members did not endure dangerous fraternity rituals in violation of the policies of Defendant OPP and USM, as well as Mississippi law; and

     e.   Were otherwise careless and negligent.

145.   Defendants Phi Rho, Nu Eta, Carter, OPP, OPPMS, and John Does 1-15 were negligent and breached the duty of care owed to Plaintiff as follows:

a. Planned and promoted an initiation ritual or event known as "Hell Night," in which pledges were required, as a condition of membership in the Fraternity, to subject themselves to the wooden paddle;

b. Required prospective members or pledges, including Plaintiff, to participate in an initiation ritual in which pledges were beaten;

c. As a condition of membership in the Fraternity, directed and encouraged harassment of pledges;

d. Failed to seek medical attention for Plaintiff after he was severely injured;

e. Actively worked to "cover up" the events that led to severely beating the pledges, including Plaintiff;

f. Officers and members created an environment conducive to abuse including, but not limited to, blindfolding, rendering him helpless to defend himself, and further created conditions where the Plaintiff was totally dependent on Carter, the officers and active members, for his well-being, and

g. Were otherwise careless and negligent.

146.    As a direct result of these negligent acts and omissions, Plaintiff suffered severe personal injuries of a physical and pecuniary nature, as well as severe emotional distress.

### FOR A FIFTH CAUSE OF ACTION
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
#### (*against the Fraternity Defendants*)

147.    Plaintiff repeats and realleges the factual allegations contained in paragraphs 1–45 and 71-83 and 139-146 as if fully restated herein.

148.    The Fraternity Defendants acted negligently or with reckless disregard for the injury that might be caused to Plaintiff in this case, and said injury was a foreseeable

consequence of the wrongful actions of the Fraternity Defendants. The Fraternity Defendants, including Phi Rho, the graduate chapter that sponsored the pledge proceedings, knew and were well aware of these pledging requirements and allowed (and sometimes assisted) the undergraduate members and Terry Carter with said pledging activities.   The Fraternity Defendants acted with reckless disregard for the life and safety of Plaintiff, and for the consequential emotional injury that the actions of the Fraternity Defendants would cause to Plaintiff.

149.    The Fraternity Defendants had a special duty to detect, report, and/or redress the wrongful actions of OPP members under their supervision.  By failing to investigate, supervise, and report the wrongful and extremely harmful acts to the authorities, and by failing to act upon the knowledge of these acts of hazing to afford Plaintiff redress and compensation, and to prevent repeated and continued abuse upon Plaintiff and to protect Plaintiff from further harm by the Fraternity Defendants, the Fraternity Defendants are liable and should be made to respond in damages.

150.    In refusing to release statements or results of the interviews, in failing to conduct a proper investigation of the wrongdoing that came to their attention, and in continuing to claim or support the claim that no wrongful pledging activity occurred to Plaintiff's detriment, the Fraternity Defendants acted negligently or with reckless disregard for the injury that might be caused to Plaintiff in this case, injury that was a foreseeable consequence of the actions of the Fraternity Defendants.

151.    By failing to report the wrongful and extremely harmful acts of OPP, OPPMS, Nu Eta, Phi Rho, and Carter to the authorities, and by failing to act upon their knowledge of these brutal acts, to afford Plaintiff redress and compensation, and to prevent repeated and continued

abuse upon Plaintiff and to protect Plaintiff from further harm by the Fraternity Defendants, they are liable, and should be made to respond in damages.

152.    As a direct and proximate result of the actions of the Fraternity Defendants, which were extreme and outrageous, Plaintiff suffered severe emotional distress for which the Fraternity Defendants are jointly and severally liable and should be made to respond in damages.

**FOR A SIXTH CAUSE OF ACTION**
**NEGLIGENCE PER SE**
***(against the Fraternity Defendants)***

153.    Plaintiff repeats and realleges the factual allegations contained in paragraphs 1–45 and 71-83 and 139-152 as if fully restated herein.

154.    Under Miss. Code § 97-3-105, it is illegal for any person or entity to haze other persons.  Specifically, the statute provides that:

> **(1) A person is guilty of hazing in the first degree when in the course of another person's initiation into or affiliation with any organization, he intentionally or recklessly engages in conduct which creates a substantial risk of physical injury to such other persons or a third person and thereby causes such injury.**
> **(2) Any person violating the provisions of subsection (1) of this section shall be guilty of a misdemeanor and, upon conviction thereof, shall be punished by a fine of not more than Two Thousand Dollars ($2,000.00) or imprisonment in the county jail for not more than six (6) months, or both.**
> **(3) A person is guilty of hazing in the second degree when, in the course of another person's initiation into or affiliation with any organization, he intentionally or recklessly engages in conduct which creates a substantial risk of physical injury to such other person or a third person.**
> **(4) Any person violating the provisions of subsection (3) of this section shall be guilty of a misdemeanor and, upon conviction thereof, shall be punished by a fine of not more than One Thousand Dollars ($1,000).**

155.    Defendants Nu Eta and Carter, individually and as representatives of Phi Rho, OPP, OPPMS, and John Does 1-15, committed hazing in the first degree in violation of Miss. Code § 97-3-105(1), by engaging in reckless conduct in the course of Plaintiff's initiation into

the Fraternity, which created a substantial risk of physical harm to Plaintiff, thereby causing Plaintiff's injuries.

156.    Defendant Terry Carter committed hazing in the second degree in violation of Miss. Code § 97-3-105(3), by engaging in reckless conduct in the course of Plaintiff's initiation into OPP, which created a substantial risk of physical harm to Plaintiff.

157.    The Fraternity Defendants created a dangerous environment surrounding their initiation process and rituals that led to a risk of harm that led to Plaintiff's injuries.

158.    Said statute imposed upon the Fraternity Defendants a duty of care in their actions towards Plaintiff, who was affiliated with OPP at the time of this incident.

159.    The Fraternity Defendants breached that duty and were negligent in at least the following respects:

    a.  Permitting and/or encouraging Carter to strike Plaintiff several times on his buttocks;

    b.  Failing to ensure that there were procedures in place to prevent people from getting injured during meetings and fraternity traditions;

    c.  Failing to stop the chapter's longstanding history of "Hell Night";

    d.  Failing to direct and instruct Carter on precisely how he was to administer the "pledging process and/or Hell Night" punishment to Plaintiff;

    e.  Beating Plaintiff and other pledges, taking money and food, intimidating them, causing sleep deprivation, threatening Plaintiff with further physical abuse; and

    f.  Failing to supervise and/or failing to implement safety rules.

160.    As a direct and proximate result of said negligence, Plaintiff was caused to suffer damages.

161.    Plaintiff's injuries and damages, as described above, are the type that Miss. Code. § 97-3-105 was designed to prevent, and Plaintiff is among the class of persons that the statute is intended to protect.

162.    As a direct and proximate result of the Fraternity Defendants' negligence per se, Plaintiff suffered physical pain, suffering, emotional distress, and injuries of a personal and pecuniary nature.

### FOR A SEVENTH CAUSE OF ACTION
### GROSS NEGLIGENCE
### (*against the Fraternity Defendants*)

163.    Plaintiff repeats and realleges the factual allegations contained in paragraphs 1–45 and 71-83 and 139-162 as if fully restated herein.

164.    The Fraternity Defendants breached their duty of care to Plaintiff by engaging in conduct which, under the particular circumstances, discloses a reckless indifference to the consequences without the exertion of any substantial effort to avoid them.    The Fraternity Defendants acted with reckless disregard for the safety of others and the consequences to Plaintiff.

165.    As the facts outline above, the Fraternity Defendants knew and were aware that their behavior, rituals, history, and initiation process posed a substantial risk of harm when performed negligently, yet they ignored it.

166.    There have been numerous incidents and occurrences where an initiate was injured due to the negligent and reckless nature of the dangerous environment that the initiation process created.

167.    Yet, the Fraternity Defendants made a conscious choice to follow and abide by their normal customary rituals and beat or allow Plaintiff to be beaten with a 2x4 cut into the shape of a paddle and causing him to spend over a week in the hospital.

168.    As a direct and proximate result of the Fraternity Defendants' gross negligence, Plaintiff suffered severe physical pain, suffering, emotional distress, and injuries of a personal and pecuniary nature.

## FOR AN EIGHTH CAUSE OF ACTION
## CIVIL CONSPIRACY
### (against Defendant Nu Eta, Defendant Phi Rho, and John Does 1-15)

169.    Plaintiff repeats and realleges the factual allegations contained in paragraphs 1–45 and 71-83 and 139-168 as if fully restated herein.

170.    As alleged above, the Fraternity Defendants acted collectively for the purpose of performing their usual and customary rituals upon Plaintiff and other pledges as a condition of initiation into the Fraternity.  Thereafter, the Fraternity Defendants conspired to conceal their unlawful and tortious conduct from authorities and other third parties, including threatening pledges, including Plaintiff, with physical harm and expulsion from OPP.  These incidents were the proximate cause of the injuries to Plaintiff.

171.    The Fraternity Defendants combined to accomplish the initiation of Plaintiff and other pledges with resultant damage to Plaintiff from the Fraternity Defendants' acts committed in furtherance of the conspiracy.

172.    As a direct and proximate result of the Fraternity Defendants' conspiracy, Plaintiff suffered severe physical pain, suffering, emotional distress, and injuries of a personal and pecuniary nature.

## FOR A NINTH CAUSE OF ACTION
## VICAROUS LIABILITY – APPARENT AGENCY
### (against Defendant OPP)

173.    Plaintiff repeats and realleges the factual allegations contained in paragraphs 1–45 and 71-83 and 139-172 as if fully restated herein.

174.    OPP, through its words and actions, presented and promoted the officers, members, and chapter advisor of Phi Rho and/or Nu Eta as its apparent agents.  It did so in a variety of ways including but not limited to the following:

   a.   Upon information and belief, sending a letter from OPP's "national headquarters" to Plaintiff, congratulating him on joining the fraternity and addressing him as a "new member";

   b.   Representing on the fraternity's website that membership in OPP would be obtained via membership in a chapter such as Nu Eta;

   c.   Creating the appearance, by virtue of its uniform use of colors, letters, and symbols, that Nu Eta, including its members, leadership, and chapter advisor, are one and the same with OPP; and

   d.   Listing the Nu Eta chapter on the OPP website's "chapter roll" as one of the fraternity's official chapters.

175.    Plaintiff decided to pledge and ultimately join OPP in reliance upon the representations that he was joining the national "brotherhood" of OPP, including but not limited to those representations stated above.

176.    Accordingly, OPP is vicariously liable for the negligence of the individual defendants named herein.

177.    As a direct and proximate result of said negligence, Plaintiff was caused to suffer the damages described herein.

## DAMAGES

178.    As a direct and proximate result of the Defendants' violation of Plaintiff's civil rights as well as their negligent, reckless, and grossly negligent actions, Plaintiff has suffered and continues to suffer damages, including, but not limited to:

    a.  Past and future medical expenses, including the costs of hospitalization, surgery, medication, and rehabilitation;

    b.  Physical pain and suffering;

    c.  Mental anguish and emotional distress;

    d.  Loss of enjoyment of life;

    e.  Loss of educational opportunities;

    f.  Impaired future earning capacity; and

    g.  Other damages as allowed by law.

## JURY DEMAND

**WHEREFORE,** Plaintiff demands a trial by jury and respectfully requests that this Court award the following damages, jointly and severally against Defendants, as provided by Federal and Mississippi law and the United States Constitution, including but not limited to the following:

    a.  Compensatory, actual, and consequential damages to Plaintiff;

    b.  Cost of this action and attorney's fees to Plaintiff for the civil rights causes of action under 42 U.S.C. § 1988'

c.  Punitive damages against all Defendants against whom punitive damages are applicable;

d.  Loss of past and future support and services with interest;

e.  Loss of earnings capacity;

f.  Pre-judgment and post-judgment interest;

g.  Such other and further relief as this Court may deem appropriate.


Respectfully submitted this 21st day of September, 2025


*Shequeena Mckenzie*

SHEQUEENA M. MCKENZIE, MSB #105667
The MCKENZIE FIRM
P.O. Box 757
Clinton, MS 39060
Telephone: 601-914-4682
Facsimile: 601-914-4657
smm@themckenziefirm.net


BAKARI T. SELLERS* (SC Bar No. 79714)
MATTHEW B. ROBINS* (SC Bar No. 103685)
STROM LAW FIRM
6923 N. Trenholm Road, Suite 200
Columbia, South Carolina 29206
Phone: (803) 252-4800
Email: bsellers@stromlaw.com
          mpacella@stromlaw.com
          awillbanks@stromlaw.com
          mrobins@stromlaw.com

*Attorneys for Plaintiff*

*\*Pro Hac Vice Applications Forthcoming*